UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,

v.                                      Case No. 24-cr-18 (BAH)

Ronald Yarborough,

        Defendant.

Motion to Dismiss Indictment

## I.   Introduction

Federal law prohibits Mr. Yarborough from possessing any firearm because he has a past felony conviction.  18 U.S.C. § 922(g)(1).  That law violates the Second Amendment to the United States Constitution, which codifies "the right of the people to keep and bear Arms," both facially and as applied to Mr. Yarborough.  In *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court upended the framework for evaluating the constitutionality of firearm regulations.  Now, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id.* at 2129-30.  To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical traditions of firearm regulation."  *Id.* This test is demanding.  A firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.  *See id.* at 2131.  Both facially and as applied to Mr. Yarborough, § 922(g)(1) cannot survive after *Bruen* for the following four reasons:

***First***, the Second Amendment's plain text—"the right of the people to keep and bear Arms, shall not be infringed"—covers Mr. Yarborough's alleged conduct.  *See* U.S. Const. amend. II. Possession of firearms obviously falls within the scope of

2

"keeping and bearing arms."  And Mr. Yarborough is part of "the people" protected by the Second Amendment, as there is nothing in the operative language that excludes those with felony convictions from "the people." *Range v. Att'y Gen. of U.S.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc) (noting the Supreme Court "explained that 'the people' as used throughout the Constitution 'unambiguously refers to all members of the political community, not an unspecified subset" (quoting *D.C. v. Heller*, 554 U.S. 570, 580 (2008)); *see also*, *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("Neither felons nor the mentally ill are categorically excluded from our national community"); *majority abrogated by Bruen*, 142 S. Ct. 2111.

The Second Amendment is one of several amendments passed in the Bill of Rights that refers to "the people."[1]  "Convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments."  *United States v. Carrero*, No. 22-cr-30, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022) (citation

---

[1] *See, e.g.*, U.S. Const. pmbl. ("We *the People* of the United States ...." (emphasis added)); U.S. Const. amend. I ("Congress shall make no law respecting ... the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." (emphasis added)); U.S. Const. amend. IV ("The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ...." (emphasis added)); U.S. Const. amend. IX (recognizing rights "retained by the people"); U.S. Const. amend. X (acknowledging the powers reserved "to the people").

omitted).  Convicted felons must therefore fall within the
"people" as contemplated by the Second Amendment, because there
is "no reason to adopt an inconsistent reading of 'the people'"
amongst the constitutional provisions.  *Range*, 69 F.4th at 102;
*see also United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th
Cir. 2015) ("the term 'the people' in the Second Amendment has
the same meaning as it carries in other parts of the Bill of
Rights" and therefore extends to all "persons who are part of a
national community").  Given that the Second Amendment is not "a
second-class right, subject to an entirely different body of
rules than the other Bill of Rights guarantees," *McDonald v.
City of Chicago*, 561 U.S. 742, 767 (2010), felons must also
retain their Second Amendment rights.

**Second**, the government cannot carry its burden to show that
§ 922(g)(1) "is consistent with the Nation's historical
tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130; *see
also Range*, 69 F.4th at 106 (analyzing historic sources and
determining the government has failed to identify a "tradition
of firearm regulation [that] supports depriving [a convicted
non-violent felon] of his Second Amendment right to possess a
firearm.").  Indeed, "the U.S. Department of Justice formally
advanced the position that early American history did *not*
support felon disarmament." *United States v. Bullock*, -- F.
Supp. 3d. --, 2023 WL 4232309, at *28 (S.D. Miss. June 28, 2023)

(citing to government representations before the Fourth and Eleventh Circuits).

Rather than permanently disarming felons, "restoring felons' rights to keep and bear arms is in keeping with our history." *Falajtar v. Att'y Gen. of the U.S.*, 980 F.3d 897, 923 (3d Cir. 2020) (Bibas, J., dissenting) (citing sources), *majority abrogated by Range*. In the colonial era, "once wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold." *Id.* Or, in the words of then-judge Barrett, the "rights of felons serving less than life were merely *suspended* during the term of the sentence," and "[t]hose who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in society without any rights and without the protection of law." *Kanter*, 919 F.3d at 461 (Barret, J., dissenting). Thus, under *Bruen*, the lack of "a comparable tradition of regulation" in the founding era means the government's prosecution is unconstitutional.

**Third**, in an exhaustive opinion following the analysis set forth in *Bruen*, the Third Circuit, en banc, held that a § 922(g)(1) prosecution was unconstitutional. *See Range*, 69 F.4th at 98. District Judge Carlton Reeves (S.D. Miss.) reached a similar conclusion, finding that the government's § 922(g)(1) prosecution against a defendant previously convicted of

"aggravated assault and manslaughter" for which he served over 15 years' imprisonment was unconstitutional under *Bruen*'s precepts.  *See Bullock*, 2023 WL 4232309.  In doing so, both courts engaged in a comprehensive historical analysis and rejected every argument made by the government as to why a § 922(g)(1) prosecution was constitutional.  Since then, numerous other district courts have done the same.  Counsel anticipates that the government will make the very same arguments that were rejected in *Range*, *Bullock*, and other courts, illustrating that its prosecution is unconstitutional in this case as well.

**Finally**, pre-*Bruen* D.C. Circuit precedent rejecting challenges to § 922(g)(1) prosecutions are no longer controlling or persuasive.  *See, e.g.*, *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019).  For starters, the D.C. Circuit has never engaged in the extensive historical analysis that *Bruen* demands. Indeed, before *Bruen*, the D.C. Circuit acknowledged the dearth of founding-era regulations disarming whole swaths of the populace simply because they had a past conviction; yet, it rejected challenges to § 922(g)(1) because "[the defendant] had not presented evidence in this case" that showed felons were allowed to possess firearms during the founding era.  *See Medina*, 913 F.3d at 161.  *Bruen* shows the D.C. Circuit had the burden exactly backwards: it is the government's burden to show

the existence of disarmament regulations, not the defendant's burden to show the absence of them.  142 S. Ct. at 2135.  After *Bruen*, the Third Circuit explicitly considered *Medina's* analysis and labeled it unpersuasive.  *See Range*, 69 F.4th at 106; *see also United States v. LeBlanc*, No. 23-cr-45, 2023 WL 8756694 at *9 (M.D. La. Dec. 19, 2023) ("*Medina v. Whitaker* [] suffers the analytical shortcomings rejected in *Bruen*").  Because *Bruen* upended the constitutional framework for reviewing firearm regulations, this Court can no longer rely on conclusions drawn by cases that failed to apply the new, controlling framework. *See, e.g.*, *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc) ("We hold that in circumstances like those presented here, where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority, a three-judge panel should consider itself bound by the later and controlling authority, and should reject the prior circuit opinion as having been effectively overruled.").

In short, § 922(g)(1) cannot survive in a post-*Bruen* world. This conclusion, although perhaps surprising, is dictated by a faithful application of the methodology set out in *Bruen*.  As of the filing of this brief, many courts have agreed.  *See, e.g.*, *Range*, 69 F.4th 96 (finding § 922(g)(1) unconstitutional as applied to defendant convicted of making false statements); *United*

*States v. Neal*, No. 20 CR 335, 2024 WL 833607, at *13 (N.D. Ill. Feb. 7, 2024) (finding § 922(g)(1) unconstitutional facially); *United States v. Anderson*, No. 1:22-CR-0594, 2023 WL 7531169 (N.D. Ill., Nov. 13, 2023) (finding § 922(g)(1) unconstitutional facially and as applied to a defendant convicted of felon in possession and armed robbery); *United States v. Prince*, No. 22-CR-240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) (finding § 922(g)(1) unconstitutional facially and as applied); *United States v. Taylor*, No. 23-cr-40001, 2024 WL 245557 (S.D. Ill. Jan. 22, 2024) (finding § 922(g)(1) unconstitutional facially and as applied to defendant convicted of conspiracy to manufacture controlled substances); *United States v. Cherry*, No. 23-CR-30112-SMY, 2024 WL 379999 (S.D. Ill. Feb. 1, 2024) (finding § 922(g)(1) unconstitutional facially and as applied to defendant convicted of aggravated robbery, attempted vehicular hijacking, and felon in possession); *United States v. LeBlanc*, No. 23-cr-00045, 2023 WL 8756694 (M.D. La. Dec. 19, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant previously convicted of armed robbery); *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant with multiple armed robbery and drug trafficking convictions); *United States v. Griffin*, No. 21-CR-00693, 2023 WL 8281564 (N.D. Ill. Nov. 30, 2023) (finding § 922(g)(1) unconstitutional as applied to

defendant convicted of possessing controlled substance, robbery, and criminal trespass); *Bullock*, 2023 WL 4232309 (finding § 922(g)(1) unconstitutional as applied to defendant convicted of aggravated assault and manslaughter); *United States v. Forbis*, No. 23-CR-133-GKF, 2023 WL 5971142, at *6 (N.D. Okla. Aug. 17, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant's marijuana possession conviction); *United States v. Jones*, No. 3:23-CR-74-CWR-LGI, 2024 WL 86491, at *2 (S.D. Miss. Jan. 8, 2024) (finding § 922(g)(1) unconstitutional as applied to defendant convicted of numerous drug felonies); *Williams v. Garland*, No. 17-CV-2641, 2023 WL 7646490 (E.D. Pa. Nov. 14, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant convicted of DUI); *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733, at *1 (M.D. Pa. Aug. 22, 2023) (finding § 922(g)(1) unconstitutional as applied to defendant convicted of possession with intent to distribute heroin and cocaine); *United States v. Williams*, No. 23-CR-20201, 2024 WL 731932, at *25 (E.D. Mich. Feb. 22, 2024) (finding § 922(g)(1) unconstitutional as applied to defendant convicted of first and second degree murder).

Indeed, although the *Bruen* argument Mr. Yarborough makes was initially slow to take off, it has gained increasing support and counsel respectfully requests that, even if this Court has held otherwise in the past, it should give this question a fresh

look.  Many judges, even those who expressly disapprove of *Bruen*'s method of historical analysis, have recognized that it leads inexorably to the conclusion that § 922(g)(1) is unconstitutional.

Because Mr. Yarborough cannot be charged with violating an unconstitutional law, the indictment must be dismissed.

## II.  Discussion

### A. *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment.

The operative clause of the Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II.  That right is not bestowed on the people by the federal government; rather, the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  This pre-existing right is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780.

Before *Bruen*, the D.C. Circuit joined other circuits in using a two-step test for Second Amendment challenges.  That test required courts to determine (1) "whether the challenged law burdens conduct protected by the Second Amendment," and if so, (2) whether the government could show that the regulation is

"substantially related to an important governmental objective."
*Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013); *see also
Medina*, 913 F.3d at 152 (same).

In *Bruen*, the Supreme Court emphatically rejected that two-
step approach, finding "it is one step too many." 142 S. Ct. at
2127. The Supreme Court instead adopted a "text-and-history
standard" for evaluating Second Amendment challenges—*i.e.*, the
textual component is now step one, and the historical component
is now step two. *Id.* at 2138. This standard's textual
component requires courts to answer a simple preliminary
question—whether "the Second Amendment's plain text covers an
individual's *conduct*." *Id.* at 2126 (emphasis added). If it
does, then "the Constitution presumptively protects that
conduct." *Id.*

The burden then shifts to the government to rebut the
presumption under the historical component. *Id.* To do so, the
government cannot follow the old playbook of showing that the
challenged law promotes an important interest. *See id.*
Instead, "the government must demonstrate that the regulation is
consistent with this Nation's historical tradition of firearm
regulation." *Id.* Only a law that is consistent with the
Nation's historical tradition is constitutional under the Second
Amendment. *Id.*

**B. The Second Amendment protects Mr. Yarborough's alleged conduct.**

The Second Amendment "presumptively protects" Mr. Yarborough's possession of firearms because "the Second Amendment's plain text covers [his alleged] conduct" in this case. *Bruen*, 142 S. Ct. at 2130.  The Second Amendment's operative clause protects "the right of the people to keep and bear Arms." U.S. Const. amend. II.  There should be no question that possession of firearms falls within the scope of "keep[ing] and bear[ing] Arms."  *See United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) ("[P]ossession of a pistol and a rifle easily fall within the purview of the Second Amendment.").

The charged conduct in this case tracks the constitutional right as defined by *Heller*.  Specifically, Mr. Yarborough is charged with possessing a "Sig Sauer Compact pistol"—*i.e.*, a pistol or handgun.  *See* ECF No. 1.  That is an "Arm."  *See Heller*, 554 U.S. at 581-82, 625, 630 (discussing how "arms" include weapons "in common use at the time" and "handguns are the most popular weapon chosen by Americans").  Likewise, to "keep" means "to retain in one's . . . possession" under the Second Amendment.  *Id.* at 582.  Thus, the Second Amendment's plain text covers Mr. Yarborough's alleged conduct.

Because the "Second Amendment's plain text covers [Mr. Yarborough's alleged] conduct, the Constitution presumptively

protects that conduct," meaning the government must now prove that its regulation of permanent felon lifetime disarmament "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S Ct. at 2130.  It cannot do so.

Before turning to the historical analysis, counsel anticipates that the government will try to claim that Mr. Yarborough is not part of the "the people" mentioned in the Second Amendment's plain text because he has a felony conviction.  As several courts have recognized, however, this argument "incorrectly 'conflates *Bruen's* first step with its second." *United States v. Banuelos*, 640 F. Supp. 3d. 716, 722 (W.D. Tex. 2022); *see also id.* at 722 n. 36 (collecting cases); *Bullock*, 2023 WL 4232309, at *21.  "Step one asks only whether 'the Second Amendment's plain text covers an individual's *conduct*,' *i.e.*, the conduct giving rise to the indictment." *Id.* at *3.  Step one "does not contemplate the actor or subject"— *i.e.*, whether the individual is a "felon"—as that is "more properly assessed under step two's historical tradition analysis." *Id.* at *3; *see also United States v. Rowson*, No. 22-cr-310, 2023 WL 431037, at *18 (S.D.N.Y. Jan. 26, 2023) ("[T]he court's focus in *Bruen* was not on potentially disqualifying status characteristics of the challengers to the statute.  It was instead on whether the Amendment's text covered the '*conduct*' the statute proscribed.").

13

Even if the Court were to consider whether Mr. Yarborough is part of "the people" at step one, he would qualify for the following three reasons.  **First**, the "plain text" of the Second Amendment does not exclude felons from its protection.  Just as the amendment's text does not "draw[] a home/public distinction with respect to the right to keep and bear arms," it does not draw a felon/non-felon distinction. *Bruen*, 142 S. Ct. at 2134. It refers only to "the people." U.S. Const. amend. II.  Under *Bruen*, the "plain text" is what controls and "[n]othing in the Second Amendment's text" excludes those who have been convicted of a felony from its protection. *See id.*

**Second**, founding era dictionaries define "people" as "those who compose a community," and extending to "every person."  *See, e.g.*, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) ("A nation; those who compose a community")[2]; Thomas Dyche & William Pardon, A New General English Dictionary (14th ed. 1771) ("People" "signifies every person, or the whole collection of inhabitants in a nation or kingdom").[3]  The Supreme Court in *Heller* consistently interpreted "the people" as "unambiguously refer[ring] to all members of the national community, not an unspecified subset."  554 U.S. at 580.  The

---

[2] Available at https://tinyurl.com/y95erjwf.

[3] Available at https://tinyurl.com/uk4b4fxd.

phrase "the people" thus created a "strong presumption that the Second Amendment is exercised individually and *belongs to all Americans*." *Id.* at 581 (emphasis added).  Indeed, *Bruen* cites *Heller* as directly stating, "[t]he Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.'"  *Bruen*, 142 S. Ct. at 2156 (emphasis added).

**Third**, "the people" is a term of art with a consistent meaning across the Bill of Rights. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  "Convicted felons fall within 'the people' as contemplated by the First and Fourth Amendments."  *United States v. Carrero*, No. 22-cr-30, 2022 WL 9348792, at *2 (D. Utah Oct. 14, 2022).[4]  "Unless the meaning of the phrase 'the people' varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude [Mr. Yarborough] is not among 'the people' for Second Amendment purposes would exclude him from those rights as well."  *Range*, 69 F.4th at 102; *see also cf. Heller*, 554 U.S. at 582, 592

---

[4] *See, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (recognizing a prisoner's First Amendment right to seek redress of grievances "[r]egardless of the prisoner's misdeed—however reprehensible"); *United States v. Lara*, 815 F.3d 605 (9th Cir. 2016) (suppressing the unreasonable search of a felon's cell phone under the Fourth Amendment).

(relying upon First and Fourth Amendment jurisprudence to interpret the Second Amendment—"it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right"); *Rowson*, 2023 WL 431037, at *17 (explaining that the Government's argument the felons are excluded from "the people" protected by the Second Amendment conflicts with *Heller*).

It is a cardinal rule of interpretation "that identical words used in different parts of the same [law] are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005).  The presumption of consistent meaning applies to the Bill of Rights because "the first ten amendments were adopted as a package"—that is, all together at the same time by the same Congress.  *United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015) ("the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community").  There is "no principled way to carve out the Second Amendment" from the other Bill of Rights provisions and impose a different definition of "the people" in that amendment alone.  *Id.* at 672; *see also Range*, 69 F.4th at 102 (finding "no reason to adopt an inconsistent reading of 'the people'" in the various constitutional provisions); *Jimenez-Shilon*, 34 F.4th at 1045

16

(seeing no "textual, contextual, or historical reason to think that the Framers understood the meaning of ['the people'] to vary from one provision of the Bill of Rights to another.").

Interpreting "the people" differently under the Second Amendment would "subject [the Second Amendment] to an entirely different body of rules than the other Bill of Rights guarantees," which the Supreme Court has expressly forbidden. *McDonald*, 561 U.S. at 780.  Thus, courts must look to the other Bill of Rights provisions when defining "the people" under the Second Amendment.  And given that a felony conviction does not exclude Mr. Yarborough from "the people" under, for example, the First and Fourth Amendments, it does not exclude him under the Second.

**C. Section 922(g)(1) violates the Second Amendment because there is no historical tradition of disarming felons in the founding era.**

Because the Second Amendment applies, "the Constitution presumptively protects [Mr. Yarborough's alleged] conduct." *Bruen*, 142 S. Ct. at 2126.  To rebut this presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot carry that burden because there is no robust tradition of "distinctly similar" laws from the founding era.  Below will discuss (1) *Bruen's* new analytical framework for evaluating history; (2) how *Bruen*'s "distinctly similar"

17

test applies; and (3) the dearth of "distinctly similar" felon disarmament laws during the founding era, meaning the government's prosecution is unconstitutional.

### 1. *Bruen* created a new analytical framework for evaluating history.

In *Bruen*, the Supreme Court set forth a two-track analysis under its historical component.  The Court explained the standard for reviewing historical evidence depends on what kind of problem a statute is intended to address—specifically, whether that problem is old or new.  *Bruen*, 142 S. Ct. at 2131-32.  Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id.* at 2131.  New problems, by contrast, are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id.* at 2132.  Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id.* at 2132. Only then will the court know which approach to employ.

*i. Track one: "distinctly similar."*  When the challenged law addresses an old problem, the test is "fairly straightforward": the government must identify a tradition of "distinctly similar" laws from the founding era.  *Bruen*, 142 S.

Ct. at 2132; *see also Range*, 69 F.4th at 103.  Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one.  The only historical regulation *Bruen* identified as distinctly similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'"  *Bruen*, 142 S. Ct. at 2153 (citing 1871 Tex. Gen. Laws § 1).  This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard.  *See id.* at 2123-24.

Bruen also noted that "*Heller* . . . exemplifies th[e] kind of straightforward historical inquiry" demanded by the "distinctly similar" test.  *Id.* at 2131.  *Heller* confirms that the standard is a strict one.  When assessing the "total[] ban[]" on handgun possession at issue in *Heller*, the Supreme Court identified only two historical laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the open carry of pistols.  554 U.S. at 628-29.  *Bruen* and *Heller* both show that the focus of the "distinctly similar" test is on historical laws that are virtually identical to the modern law.

*ii. Track two: "relevantly similar."*  When the challenged law addresses a new problem, the test is "more nuanced." *Bruen*, 142. S. Ct. at 2132.  Courts must determine if the challenged

modern law fits into a "relevantly similar" tradition of historical laws. *Id.* The Supreme Court identified two "central considerations" for courts to determine if laws are relevantly similar: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In other words, the government need not identify a "historical twin," but it still must show that the regulations are aligned as to "*how* and *why* [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

The "relevantly similar" test is less difficult for the government to satisfy because it allows for "analogical reasoning." *Id.* at 2132. But courts may use this test only when the challenged law is aimed at a societal problem that was "unimaginable at the founding." *Id.* It is not available when the challenged law addresses an old problem—that is, one which "has persisted since the 18th century." *Id.* at 2131. When a law addresses an old problem, it must satisfy the stringent "distinctly similar" test; there must be a historical tradition of laws that are virtually identical to the modern law. *Id.* at 2153; *Heller*, 554 U.S. at 628-29.

**iii. *Relevant timeframe.*** Regardless of whether the case calls for the stringent "distinctly similar" or the looser "relevantly similar" test, the relevant "historical tradition"

20

is that which existed when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2136. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (emphasis in original). Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period but should do so with care. *Id.* at 2131-32. *Bruen* cautioned that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not rely on practices "that had become obsolete in England at the time of the adoption of the Constitution and never [were] acted upon or accepted in the colonies." *Id.*

Likewise, courts must not "giv[e] postenactment history more weight than it can rightly bear." *Id.* While evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time one goes from 1791. *Id.* at 2136-37. The Court recognized that "discussions of the right to keep and bear arms" that took place after the Civil War (1865) provided less insight into the Second Amendment's original meaning than earlier

sources because they took place roughly 75 years after its ratification (in 1791). *Id.* at 2137. Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight. *See id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791); *see also Range*, 69 F.4th at 104 ("[W]e are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratifications—falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right.").

Furthermore, the comparable tradition of regulation must be "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can guide [courts'] interpretation of an ambiguous constitutional provision" only if that practice "has been open, widespread, and unchallenged since the early days of the Republic."). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" are not enough to establish a historical tradition. *Id.* at 2153, 2156. For instance, the Supreme Court

doubted laws from three of the thirteen original colonies were enough to show a relevant tradition.  *See id.* at 2142.

   *iv. Government's burden.*   Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a law] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135.  Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. Accordingly, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute.  That is [the government's] burden." *Id.* at 2150. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11; *see also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend" a law).

   2. ***Bruen*'s stringent "distinctly similar" test applies because § 922(g)(1) addresses a problem that was well-known in the founding era.**

   The government must satisfy the demanding "distinctly similar" test because § 922(g)(1) addresses a "general societal problem"—*i.e.*, felons' access to guns—that existed when the Second Amendment was ratified in the 18th century.[5]  *See, e.g,*

---

[5] The government cannot defend § 922(g)(1) through "analogical reasoning" and the "relevantly similar" test, which are reserved

*Griffin*, 2023 WL 8281564, at *4 (applying the distinctly similar standard because "the problems of crime and recidivism have always existed in this nation."). To do so, the government must show a robust tradition of virtually identical laws around 1791. *See Bruen*, 142 S. Ct. at 2153 (comparing challenged law to virtually identical Texas law); *Heller*, 554 U.S. at 628-29 (comparing challenged law to two virtually identical laws). A historical law that is "distinctly similar" to § 922(g)(1) would thus be one that either denied or substantially abridged felons' access to firearms.

3. **The government cannot carry its burden to show that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation" because felon disarmament laws did not exist until the 20th century.**

The government cannot carry its burden to show that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" for a simple reason: felon disarmament laws did not exist until the 20th century. Indeed, before *Bruen* was decided, "the U.S. Department of Justice formally advanced the position that early American history did *not* support felon disarmament." *United States v. Bullock*, 2023 WL 4232309, at *28; *see also* U.S. Brief in *United States v.*

---

for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Bruen*, 142 S. Ct. at 2132. After all, the potential danger posed by felons' access to firearms would hardly have been foreign to the Founders.

*Staten*, No. 10-5318, 2011 WL 1542053, at *25 (4th Cir. Apr. 25, 2011) ("As for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms.").  As the government previously represented to other courts of appeals, "18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." U.S. Brief in *United States v. Pettengill*, No. 10-2024, 2011 WL 1977759, at **27-28 (1st Cir. May 13, 2011).

The government was correct.  The journey to what is now § 922(g)(1) began with the Federal Arms Act of 1938 (FFA).  *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)).  At that time, the law did not disarm *all* felons, but only those who were convicted of a "crime of violence," which the Act defined as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by more than one year." Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250 (1938).

In 1961, Congress expanded the FFA's scope by prohibiting "*all* felons," not just those convicted of specified violent crimes, from engaging the proscribed conduct.  *See An Act to Strengthen the Federal Firearms Act*, Pub. L. No. 87-342, 75

Stat. 757 (1961).  Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Skoien*, 614 F.3d at 640.

Thus, § 922(g)(1) "is firmly rooted in the twentieth century," *Booker*, 644 F.3d at 24—a century and a half after the Second Amendment's adoption.  The *Bruen* Court said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their amici," since evidence of that type "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.  Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Bruen*, 142 S. Ct. at 2137; *see also Range*, 69 F.4th at 104 (finding any reliance on the 1938 Federal Firearms Act "a dubious proposition given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources").

Here, § 922(g)(1) does not confirm an earlier practice.  Even Justice Breyer in his dissent in *Bruen* specifically referenced the recent "historical pedigree" of § 922(g):

> The Court disregards "20th-century historical evidence."  But it is worth noting that the law the Court strikes down today is well over 100 years old, having been enacted in 1911 and amended to substantially its present form in 1913.  That alone gives it a longer historical pedigree than at least three of the four types of firearms regulations that *Heller* identified as "presumptively lawful." 554 U.S. at 626–627, and n. 26, 128 S.Ct. 2783; see C. Larson, *Four Exceptions in Search*

> *of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1371, 1374–1379 (2009) (concluding that " 'prohibitions on the possession of firearms by felons and the mentally ill [and] laws imposing conditions and qualifications on the commercial sale of arms' " have their origins in the 20th century); *Kanter v. Barr*, 919 F.3d 437, 451 (CA7 2019) (Barrett, J., dissenting) ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons"). Like Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding. . . . But unlike Justice KAVANAUGH, I find the disconnect between *Heller*'s treatment of laws prohibiting, for example, firearms possession by felons or the mentally ill, and the Court's treatment of New York's licensing regime, hard to square. The inconsistency suggests that the Court today takes either an unnecessarily cramped view of the relevant historical record or a needlessly rigid approach to analogical reasoning.

*Bruen*, 142 S. Ct. at 2184 (Breyer, J., dissenting).  The majority opinion voiced no disagreement with this characterization of the recency of the felon-in-possession laws— nor could it.

Section 922(g)(1) "bears little resemblance to laws in effect at the time the Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012).  In 2007, a history professor at the University of Hartford undertook "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007).  Based on that survey, Professor Churchill concluded

that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142.  A professor at the University of California-Davis School of Law agrees with Professor Churchill, noting that "state laws prohibiting felons from possessing firearms or denying firearms license to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009).

Other scholars agree.  Although it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009).  It appears that no state passed a felon-disarmament law until 1923.  *Id.; see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar).

In short, there was no historical tradition around 1791 of gun regulations "distinctly similar" to § 922(g)(1).  *See Range*,

69 F.4th at 104; *Bullock*, 2023 WL 4232309, at *21.  The

"Founders themselves could have adopted" felon-disarmament laws

to address the "perceived societal problem" posed by felons'

access to guns.  *Bruen*, 142 S. Ct. at 2131.  But they did not.

*See Kanter*, 919 F.3d at 451 (Barrett, J., dissenting)

("Founding-era legislatures did not strip felons of the right to

bear arms simply because of their status as felons.").  Such

laws were not passed until the 20th century.  Regulations of

such recent vintage cannot establish a historical tradition.

*Id.* at 2137.  Because § 922(g)(1) does not fit in a robust

historical tradition of distinctly similar regulations, it is

unconstitutional.

> **D. The Third Circuit's recent en banc decision (among others) rejected all the government's arguments and compels the conclusion that its § 922(g)(1) prosecution is unconstitutional.**

In an exhaustive opinion following *Bruen*, the Third Circuit

held that a § 922(g)(1) prosecution was unconstitutional.  *See*

*Range v. Att'y Gen. of U.S.*, 69 F.4th 96 (3d Cir. 2023) (en

banc).  There, the Third Circuit rejected every argument made by

the government that the government is likely to make here.  As

such, the Third Circuit's *Range* decision compels the conclusion

that the government's prosecution is unconstitutional here as

well.  Other federal court decisions compel this conclusion as

well.  *See, e.g.*, *Bullock*, 2023 WL 4232309, at *28 (finding

29

§ 922(g)(1) prosecution against an arguably violent felon unconstitutional); *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023) (finding § 922(g)(8) prosecution unconstitutional).

Beginning with *Bruen*'s threshold question, the Third Circuit had no difficulty finding that the Second Amendment's plain text covered his conduct of possessing "a rifle to hunt and a shotgun to defend himself at home." *Id.* at 103.   The court succinctly stated the obvious: "It does." *Id.*

The court also rejected all the government's arguments for why Mr. Range's felony conviction excluded him from being part of "the people."   First, the government claimed *Heller*, *McDonald*, and *Bruen* limited the Second Amendment's reach when it repeatedly used the phrase "law-abiding, responsible citizens" to discuss Second Amendment protections. *Id.* at 102.   The Third Circuit disagreed.   Indeed, it faulted the government for essentially cherry picking "dicta." *Id.*   In the Third Circuit's words, "*Heller* said more; it explained that 'the people' as used throughout the Constitution 'unambiguously refers to *all* members of the political community, not an unspecified subset." *Id.* at 101 (quoting *Heller*, 554 U.S. at 580).   Numerous other courts, post-*Bruen*, have likewise agreed that the Supreme Court's

reference to "law-abiding, responsible citizens" is mere dicta. *See, e.g.*, *Bullock*, 2023 WL 4232309, at *17 (citing cases).[6]

Second, the court recognized that "other Constitutional provisions reference 'the people'" and it saw "no reason to adopt an inconsistent reading of 'the people.'" *Range*, 69 F.4th 102. Third, the court agreed with then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, "in which she persuasively explained that 'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* at 102 (quoting *Kanter*, 919 F.3d at 452). Fourth, it reasoned that the phrase "law-abiding, responsible citizens" was too vague and arbitrary. *Id.* It underscored that such an approach would give "authority to legislatures to decide who to exclude from 'the people.'" *Id.* And it harbored great reservations that such "extreme deference" would give "legislatures unreviewable power to manipulate the

---

[6] *See also, e.g.*, *United States v. Goins*, No. 5:22-cr-91, 2022 WL 17836677, at *5 (E.D. Ky. Dec. 21, 2022) ("[T]he Supreme Court's determination that law-abiding status is sufficient to qualify for protection does not imply that only law-abiding citizens hold rights under the Second Amendment."); *United States v. Ware*, No. 22-cv-30096, 2023 WL 3568606, at *5 (S.D. Ill. May 9, 2023) ("The language 'law-abiding' as used both in *Heller* and *Bruen* does not alter who the Second Amendment applies to, but rather describes the individuals involved in those cases."); *United States v. Harrison*, No. 5:22-cr-328, ECF No. 36 at 8-9 (W.D. Okla. Feb. 2023) ("*Bruen* noted that it was undisputed that the plaintiffs in that case were part of the people protected by the Second Amendment, so at best, the United States is relying on dicta.").

Second Amendment by choosing a label." *Id.* at 103 (quoting *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting)).  In the end, the Third Circuit "reject[ed] the Government's contention that only 'law-abiding, responsible citizens' are counted among 'the people.'" *Id.*

Turning to *Bruen*'s second step, the Court found that the government failed to carry its burden of demonstrating felon disarmament "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 103.  The government first relied on the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* (quoting *Heller*, 554 U.S. at 626).  As the Supreme Court acknowledged in *Heller*, however, it did not "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment in that case." *Id.* at 104 n.7.  Accordingly, the Third Circuit did not treat this dictum as a holding in that case. *Id.* at 104.

The Third Circuit then engaged in a more exhaustive historical analysis than the Supreme Court and determined that that only since 1961—through an amendment to the Federal Firearm's Act—has the federal government disarmed felons. *Id.* The earliest version of that statute from 1938 applied only to those convicted of "crimes of violence." *Id.*  The Third Circuit

32

reasoned that whether using 1961, 1938, or some other regulation
from the 20th century, they were all too recent to fall within
the necessary definition of "historical tradition." *Id.* at 104
n.8 ("20th-century evidence ... does not provide insight into
the meaning of the Second Amendment when it contradicts earlier
evidence." (quoting *Bruen*, 142 S. Ct. at 2154 n.28)).

The court further rejected the government's attempted
analogy to the disarmament laws against "Loyalists, Native
Americans, Quakers, Catholics, and Blacks." *Id.* at 105.  The
Court found that historical practice to be "far too broad,"
constitutionally suspect because they were racist and bigoted,
and readily distinguishable because they had nothing to do with
felons.  *Id.*; *see also United States v. Rahimi*, 61 F.4th 443,
456 (5th Cir. 2023) (rejecting the Government's argument that
these founding era laws were sufficiently analogous to establish
constitutionality of § 922(g)(8)).  More on point was the fact
that "[e]ven arms used to commit crimes bordering on treason
were sometimes returned to the perpetrators during the Founding
era."  *See id.* at 106 n.10.[7]

_____

[7] The defense is dismayed by the government's continued reliance
on such obviously bigoted laws to justify section 922(g)(1).
These laws, enacted for obviously racist and discriminatory
purposes, cannot impose a "comparably justified" burden on the
right of armed-self defense.  "The government essentially expands
on *Bruen*'s test to argue that the denial of all constitutional
rights at the founding can justify the denial of some
constitutional rights today." *Griffin*, 2023 WL 8281564, at *6.

The *Range* court also rejected the government's argument that historically felons received more severe punishments compared to losing the right to bear arms—namely, execution or estate forfeiture.  *Id.* at 105.  Starting with execution, the court reasoned that even though "founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Id.*  That founding-era governments executed some individuals "does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed."  *Id.*  Rather, history shows "a felon could 'repurchase arms' after successfully completing his sentence and reintegrating into society."  *Id.*  The same holds true for estate forfeiture.  While "[f]ounding-era laws often prescribed the forfeiture of the weapon used to commit a firearms-related offense," it did not impact the "perpetrator's right to keep and bear arms generally."  *Id.*  Nothing prevented the offender from merely repurchasing arms.  *Id.*  All told, the Third Circuit

---

"The government should be careful in 'pick[ing] [its] friends out of history's crowd.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2180 (Breyer, J. dissenting)). Indeed, defense counsel would be "remiss in failing to point out that the government's characterization of [Mr. Yarborough], a Black man, as an untrustworthy adherent to the law would have been the same characterization the founders had about the enslaved Africans." *Id.*

found that § 922(g)(1) is not even "'relevantly similar' to earlier statutes allowing for execution and forfeiture." *Id.*

No doubt that the government will highlight that *Range*'s majority decision was expressly "a narrow one," limited to individuals "like Range." *Id.* at 106. But if the government could not identify a sufficient historical tradition of disarming someone like Mr. Range, it is unclear how they could do so here. Indeed, in a case involving a § 922(g)(1) prosecution of a defendant previously convicted of "aggravated assault and manslaughter," for which he received over 15 years' imprisonment, the government could not identify a sufficient historical tradition of disarming that individual—and the court even offered to appoint an expert historian to assist in the task. *See Bullock*, 2023 WL 4232309, at *28. As such, the court in *Bullock* found the government's § 922(g)(1) prosecution against an arguably violent felon unconstitutional. *See id.* The historical sources involving disarmament of felons applicable to *Range*, *Bullock*, and Mr. Yarborough are the same. Given that the government could not meet its burden with respect to Mr. Range or Mr. Bullock, these opinions compel the conclusion that it cannot do so here. *See also, e.g.*, *United States v. Taylor*, No. 23-cr-40001, 2024 WL 245557 (S.D. Ill. Jan. 22, 2024) (finding § 922(g)(1) facially unconstitutional); *United States v. LeBlanc*, No. 23-cr-00045, 2023 WL 8756694 (M.D. La. Dec.

19, 2023) (finding § 922(g)(1) prosecution unconstitutional as applied to individual previously convicted of armed robbery for which he received 15 years' imprisonment).[8]

### E. The D.C. Circuit's Second Amendment decisions are no longer controlling or persuasive after *Bruen*.

Before *Bruen*, the D.C. Circuit had rejected Second Amendment challenges to § 922(g)(1) in *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) and *Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019). Neither of these cases can survive *Bruen*.

In *Schrader*, the D.C. Circuit held that § 922(g)(1) survived a facial constitutional challenge, but its reasoning was premised predominately on the means-end analysis. *See Schrader*, 704 F.3d at 293. *Bruen* leaves no room for doubt: text and history, *not* a means-end analysis, define the Second Amendment's protections. *See Bruen*, 142 S. Ct. at 2127. As such, *Bruen* abrogated *Schrader.*

Similarly, the D.C. Circuit in *Medina* built off *Schrader* to reject an as-applied challenge to § 922(g)(1) involving a non-violent felon. The D.C. Circuit held that "those convicted of

---

[8] The government cannot meet its burden to show that § 922(g)(1) is facially constitutional. But, pursuant to *Range*, *Bullock*, and similar cases, this Court can make a narrower as applied holding if it wants. Instead of striking § 922(g)(1) down in its entirety, this Court can simply conclude that the government has failed to meet its burden in this particular case and, thus, the law is unconstitutional as applied to Mr. Yarborough in this prosecution.

felonies [whether violent or not] are not among those entitled
to possess arms." *Medina*, 913 F.3d at 160.  But *Medina* is no
longer controlling or persuasive after *Bruen* for the following
reasons.

**First**, the comprehensive historical and plain language
analysis conducted by the Third Circuit, as now required by
*Bruen*, was absent from the D.C. Circuit's pre-*Bruen Medina*
decision.  Such an analysis demonstrates felons are included in
"the people" protected by the Second Amendment, and the
government cannot meet its burden of showing § 922(g)(1) is
consistent with this Nation's historical tradition of firearm
regulation.  *Range*, 69 F.4th at 104 (citing *Bruen*, 142 S. Ct. at
2130).  Because *Bruen*'s new analytical framework did not exist
at the time *Medina* was decided, the D.C. Circuit did not apply
the appropriate framework or presumptions, making its entire
analysis flawed from the outset.  Indeed, the Third Circuit
expressly considered *Medina* after *Bruen* was decided and found it
to be unpersuasive.  *See Range*, 69 F.4th at 106; *United States
v. Leblanc*, -- F. Supp. 3d --, 2023 WL 8756694, at *8 (M.D. La.
Dec. 19, 2024) (noting *Medina* "suffers [from] the analytical
shortcomings rejected in *Bruen*").

**Second**, the burden analysis was not properly conducted in
*Medina*.  In *Range*, for instance, the government was unable to
cite "a single statute or case that preclude[d] a convict who

37

has served his sentence from purchasing that same type of object that he used to commit the crime" or even any "forfeiture cases in which the convict was prevented from regaining his possessions, including firearms (except where forfeiture preceded execution)." *Range*, 69 F.4th at 105.  And in *Medina*, the D.C. Circuit acknowledged the dearth of founding-era regulations disarming individuals simply because they had a past conviction.  *See* 913 F.3d at 161 (recognizing there were "few primary sources directly on point").  Yet, the D.C. Circuit rejected the challenge to § 922(g)(1) because "[the defendant] had not presented evidence in this case" that showed felons were allowed to possess firearms during the founding era.  *See id.* But *Bruen* shows the D.C. Circuit had the burden exactly backwards: it is the government's burden to show the existence of disarmament regulations, not the defendant's burden to show the absence of them.  142 S. Ct. at 2135.

**Third**, while *Medina* conducted some historical analysis, it was unmoored from *Bruen*'s analytical framework.  *Bruen* requires that the regulations targeting longstanding problems must be "*distinctly similar*" to a historical analogue of firearm regulations. 142 S. Ct. 2131.  Nowhere does the *Medina* court identify such an analogue.  Instead, it relied predominantly on the belief that "founding-era felons" were often punished with "death" and "estate forfeiture" and so found it "difficult to

38

conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." 913 F.3d at 158. That misses the mark. Indeed, the Seventh Circuit just recently faulted the government's reliance on this argument: "that felons like [defendant] were historically subject to execution and estate forfeiture, as well as the loss of other civic rights" presents "nothing close to what would satisfy the demanding standard set forth in *Bruen*." *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023).

As several jurists have recognized after *Medina* was decided, the factual underpinnings of its holding are "shaky," because throughout "the seventeen and eighteen centuries, capital punishment in the colonies was used 'sparingly,' and property crimes including variations on theft, burglary, and robbery 'were, on the whole, not capital.'" *Kanter*, 919 F.3d at 459 (Barrett, J. dissenting). "Most punishments were temporary." *Foljtar*, 980 F.3d at 923 (Bibas, J., dissenting). And the "colonists did not treat ex-cons as a permanent exiled underclass," forever disbarred from possessing a weapon. *Id.* Rather, "[o]nce wrongdoers had paid their debts to society, the colonists forgave them and welcomed them back into the fold." *Id*.

More fundamentally, *Medina*'s focus on the historical treatment of felons that were executed tells us nothing about whether there is a historical tradition of disarming *surviving* felons of their rights after they have returned to society; let alone those, as Mr. Yarborough here, who were never convicted of a death-eligible crime to begin with. *Id.* at 912; *see also Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). The two are not "distinctly similar." After all, "we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). Nor would we say that "because the state used to execute felons, it may now permanently strip them of their freedom of religion." *Flajtar*, 980 F.3d at 921 (Bibas, J., dissenting). "The obvious point that the dead enjoy no rights" is thus not a sufficient historical analogue for "what the founding-era generation would have understood of felons who lived, discharged their sentences, and returned to society." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting); *see also Taylor*, 2024 WL 245557, at *5 (finding capital punishment laws distinguishable, in part, because "they were imposed for criminal conduct; not for status crimes that arose from otherwise lawful conduct by felons who had completed their sentences").

**Fourth**, the historical sources *Medina* relied upon would no longer be sufficient under *Bruen*.  For example, *Medina* cited to a "1787 *proposal* before the Pennsylvania ratifying convention, where the Pennsylvania Minority suggested adding language to its Constitution that "no law shall be passed for disarming the people or any of them *unless for crimes committed,* or real danger of public from individuals."  *Medina*, 813 F.3d at 158 (first emphasis added).  This historical evidence has no relevance under *Bruen*'s analytical framework because the Pennsylvania Minority did not even convince Pennsylvania, much less the rest of the states, to adopt it.  An unadopted proposal is not a widely held understanding of a right, *see Rahimi*, 61 F.4th at 457; nor is it analogous to this "Nation's historical tradition of firearm regulation"—indeed, an unadopted proposal is not a "regulation" at all.  *See Bruen*, 142 S. Ct. at 2126 (emphasis added); *see also cf. id.* at 2153, 2156 (discussing how a handful of "outliers" from a small number of "outlier jurisdictions" are not enough to establish a historical tradition); *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting) (noting "none of the [proposal's] relevant limiting language made its way into the Second Amendment").

The *Medina* court next cited to disarmament laws against Loyalists in Massachusetts and Pennsylvania during the revolutionary period, but *post-Bruen*, several circuits have

found these to be "far too broad" and distinguishable to satisfy *Bruen*'s demands. *Range*, 69 F.4th at 105; *Rahimi*, 61 F.4th at 456 (finding analogies to "disloyal" people distinguishable and "dubious, at best"); *see also*, *Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) (reviewing Massachusetts and Pennsylvania laws and finding "neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons."); *Taylor*, 2024 WL 245557, at *5 (finding Loyalist laws distinct because they permitted individuals "to regain their right to posses firearms by swearing an oath of allegiance" whereas § imposes "lifetime dispossession and criminalization"—"a significantly greater burden").

**Finally**, *Medina* greatly relied upon the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons," 554 U.S. at 627, but *Bruen* confirms that statement was non-binding dicta in at least two ways.  For starters, the majority opinion in *Bruen* did not recommit to upholding felon-in-possession laws; rather, that admonition appeared only in a concurring opinion.  This was no oversight. Justice Thomas, the author of the *Bruen* majority opinion, previously recognized in *Voisine v. United States*, 579 U.S. 686, 715 (2016) that *Heller's* discussion of felon disarmament laws

was unquestionably "dicta."  Indeed, *Heller* itself stated that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us," 554 U.S. 570, 635, thus making clear it was not deciding that issue.

Moreover, in the same paragraph that *Heller* casually referred to § 922(g)(1) as a "long standing prohibition" without doing an "exhaustive historical analysis of the full scope of the Second Amendment," 554 U.S. at 626, the Court also stated that "the majority of the 19th century courts to consider the question [of carrying concealed weapons] held that such prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Id.* (citing two cases and two treatises as support).  Despite this, 14 years later in *Bruen*, the Court reconsidered that question anew.  It conducted an exhaustive historical analysis and applied a new and very strict burden of rules.  And after doing so, it concluded that the government had *not* met its "burden to identify" a "distinctly similar" "American tradition" justifying New York's proper cause restriction on the public carrying of firearms.  *Bruen*, 142 S. Ct. at 2156.  If *Heller's* casual description of concealed-carry bans as "longstanding" and "constitutional" had been a dispositive holding rather than dicta, *Bruen* would have been an easy case—the Court would simply have deferred to

43

*Heller's* approval of such laws and upheld New York's statute on that basis.  But of course, that is not what the Court did.  It reached the opposite conclusion of its offhand remark in *Heller*, holding that some laws burdening concealed carry are *unconstitutional*.  Thus, *Bruen*'s explicit contradiction of *Heller*'s dicta regarding the longstanding nature of concealed-carry bans is proof that the D.C. Circuit's reliance on the same "longstanding prohibition" dicta regarding felon dispossession was misplaced.

After *Bruen*, many courts have rightly recognized that this single *Heller* sentence was indeed non-binding dicta.  *See, e.g.*, *Range*, 69 F.4th at 104; *Atkinson v. Garland*, 70 F.4th at 1022 (rejecting government's reliance on "oft-quoted dicta describing felon-in-possession laws as 'presumptively lawful," because "[n]othing allows us to sidestep *Bruen* in the way the government invites."); *Bullock*, 2023 WL 4232309, at *17.[9]

---

[9] *See, also*, *e.g.*, *United States v. Quiroz*, 629 F. Supp. 3d 511, 518 (W.D. Tex. 2022) (holding that a crucial problem with the government's argument "is that *Heller*'s endorsement of felon-in-possession laws was in dicta. Anything not the 'court's determination of a matter of law pivotal to its decision' is dicta. Dicta is therefore 'entitled to little deference because they are essentially ultra vires pronouncements about the law. Or, as Francis Bacon put it, dicta is only the 'vapours and fumes of the law.'") (citations omitted); *see also* R&R in *United States v. Pierre*, No. 22-cr-20321, ECF No. 53 at 17-18 (S.D. Fla. Nov. 28, 2022) (recognizing "that language in *Heller* is dicta").

All told, the D.C. Circuit's pre-*Bruen* precedent cannot be reconciled with *Bruen* because it has never engaged in the analytical framework *Bruen* requires.  It failed to apply appropriate presumptions, burdens, or engage in the extensive historical analysis for "distinctly similar" prohibitions on firearm possession by felons during the founding era.  Because the D.C. Circuit has never engaged in the appropriate analysis, this Court must.

### III. Conclusion

Mr. Yarborough's possession of a firearm is protected by the Second Amendment.  The government cannot carry its burden to show a historical tradition of "distinctly similar" prohibitions on firearm possession by felons because such laws are creatures of the 20th century.  As such, the government's prosecution of Mr. Yarborough under § 922(g)(1) violates the Second Amendment, both facially and applied to Mr. Yarborough, and must be dismissed.

Respectfully submitted,

A. J. KRAMER
Federal Public Defender

_____/s/_____
DIANE SHREWSBURY
Assistant Federal Public Defender
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004